# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

JAMES CHRISTOPHER WHITE, et al,   )
                                )      Case No. 1:23-cv-108
       *Plaintiffs*,         )
                                )      Judge Travis R. McDonough
v.                             )
                                )      Magistrate Judge Christopher H. Steger
HAMILTON COUNTY TENNESSEE, et   )
al,                               )
                                )
       *Defendants*.        )

---

## MEMORANDUM OPINION

---

Before the Court are the following motions: (1) Defendant Hamilton County, Tennessee's motion for summary judgment (Doc. 55); (2) Defendants Quality Correctional Healthcare of Tennessee, PLLC, Lorie Graves, Erica Watson, and Amie Durham's motion for summary judgment (Doc. 48); (3) Defendant Jim Hammond's motion for summary judgment (Doc. 56); and (4) Defendants John and Jane Does 1-15's motion for summary judgment (Doc. 57). Plaintiffs do not oppose the entry of summary judgment in favor of Graves, Watson, Durham, Hammond, or John and Jane Does 1-15; they oppose summary judgment for Hamilton County and Quality Correctional Healthcare of Tennessee, PLLC only. (*See* Doc. 76, at 1; Doc. 78, at 1.)

For the following reasons, the Court will (1) **GRANT** Defendant Hamilton County, Tennessee's motion for summary judgment (Doc. 55); (2) **GRANT IN PART** and **DENY IN PART** Defendants Quality Correctional Healthcare of Tennessee, PLLC, Lorie Graves, Erica Watson, and Amie Durham's motion for summary judgment (Doc. 48); (3) **GRANT** Defendant

Jim Hammond's motion for summary judgment (Doc. 56); and (4) **GRANT** Defendants John and Jane Does 1-15's motion for summary judgment (Doc. 57).

## I. BACKGROUND

Plaintiffs Andrea White and James Christopher White (collectively, "Plaintiffs") are the surviving daughter and husband of Carol Rene White, who died at fifty-three years old while incarcerated at the Silverdale Detention Center[1] ("Silverdale"). (*See* Doc. 1, at 2.) Andrea White is suing as the Administrator *ad litem* of White's estate, and James Christopher White is suing individually and as White's next of kin. (*See id.* at 1.)

At all relevant times, Defendant Hamilton County, Tennessee (the "County"), operated Silverdale; Defendant Jim Hammond was the Sheriff of Hamilton County; Defendant Quality Correctional Healthcare of Tennessee, PLLC ("QCHC") contracted with the County to provide healthcare at Silverdale; Defendants Lorie Graves, Erica Watson, and Amie Durham were medical personnel working at Silverdale and employed by QCHC; and Defendants John and Jane Does 1-15 were "agents, staff, guards, correctional officers, nurses, doctors or other health providers of Silverdale or another entity charged with Carol White's medical care, treatment and safety at the time of her detention." (Doc. 1, at 6; *see id.* at 4–6; Doc. 58, at 4–6; Doc 78, at 2.)

Plaintiffs represent, and Defendants do not dispute, that on May 11, 2022, after pleading guilty to driving while under the influence, White was sentenced to a term of forty-five days by the Honorable Tom Greenholtz of Hamilton County Criminal Court. (*See* Doc. 80, at 4–5.) According to Andrea White, White was taking three prescription medications at this time: (1) divalproex (or Depakote), 500 mg, which the prescribing physician told her to stop taking "under

---

[1] The record contains references to this facility as both the "Silverdale Detention Center" and the "Silverdale Detention Facility." (*See generally* Docs. 49, 51, 52, 54, 80.)

no circumstances," for bipolar disorder and seizure prevention; (2) levothyroxine, 125 mg, a thyroid medication; and (3) hydroxyzine, 50 mg, for sleep. (Doc. 80, at 4–5.) Further according to Andrea White, White was concerned about her ability to access her medications at Silverdale and, particularly for the divalproex and levothyroxine, "afraid" and "worried about what would happen to her" if she was not able to take those medications as prescribed. (*Id.*) Plaintiffs represent, and no defendant disputes, that White brought prescription bottles containing these three medications with her to Silverdale, where they were placed in evidence bags with her other personal belongings, and that those bottles would remain in the bags for the duration of her incarceration. (*See* Doc. 80, at 5, 7–12.)

On White's custody order for Silverdale, which is signed by Judge Greenholtz, there is a handwritten note (that appears to be initialed by him) that reads, "Other: Medication to be allowed: Divalproex 500 mg[;] Hydroxyzine: 50 mg[;] Levothroxine [sic]: 125 mg." (Doc. 49, at 60.) On the morning of May 11, at 8:51 AM, Judge Greenholtz's judicial assistant sent an email regarding White's custody order to "Division2Filing," "EveryCorrectionsSupervisor," and "EverySentenceManagement," copying "attorneyphilduval@gmail.com" and "chris.post@hcdatn.org." (Doc. 54, at 147.) This email read,

> Please accept for filing this Order from the Second Division of the Hamilton County Criminal Court, to be effective as of this date.
>
> **TO SILVERDALE**: Please note, Defendant was taken into custody this morning.
>
> **Medication to be allowed**: Divalproex 500 mg; Hydroxyzine 50 mg; and Levothroxine [sic] 125 mg.

(*Id.* (emphases in original).) At 9:06 AM, a records specialist at Silverdale forwarded the email to "hamiltoncotn.clinicalsupervisor@qchcweb.net" and "hamiltoncotn.admin@gchcweb.net," copying "EverySentenceManagement@hcsheriff.gov." (*Id.*) Further emails in the record reflect

3

that the email originally from Judge Greenholtz's chambers was received by at least five other individual Hamilton County and QCHC employees. (*See* Doc. 47, at 149, 151–54; *see also* Doc. 54, at 143–45.) QCHC's CEO, Dr. Johnny Bates, testified regarding the note on White's custody order that, "with all due respect to the judge, that order is not enforceable." (Doc. 80, at 21.)

Five days later, on the afternoon of May 16, 2022, White would be transported from Silverdale to Erlanger Hospital and pronounced dead upon arrival. (*See* Doc. 49, at 65.) A postmortem examination performed at the Hamilton County Forensic Center lists White's cause of death as "[c]ombined toxicity, methadone and olanzapine." (*Id.* at 66–67.) Plaintiffs represent, and no defendant disputes, that methadone was in White's system because (in addition to the three medications discussed above and mentioned on Judge Greenholtz's order) she "had been a prescribed methadone user for the last fifteen (15) years." (Doc. 76, at 12.)[2] Plaintiffs do not dispute the clinical cause of death as documented in the autopsy report; rather, their theory is that Defendant Watson erroneously administered olanzapine—when she was supposed to administer divalproex that had been ordered by QCHC—to White on the morning of May 16, which resulted in the fatal mixing of methadone and olanzapine. (*See id.* at 6; Doc. 78, at 5–6.)

Before proceeding further, the Court offers an observation about the Parties' submissions on the instant motions. Plaintiffs take issue with, and cite evidence to establish, numerous ways in which the defendants treated White poorly throughout her time at Silverdale. It is not always clear, however, how these contentions fit within Plaintiffs' theory that White's death was caused by the erroneous administration of her medications. Likewise, not all the ways that White was allegedly mistreated conform to cognizable legal claims against the County or QCHC. For

---

[2] There is nothing in the record to indicate that White attempted to bring methadone with her to Silverdale or otherwise sought to obtain it while incarcerated.

instance, Plaintiffs contend that White experienced methadone withdrawal at Silverdale, such that medical personnel should have observed her withdrawal symptoms, and QCHC, for its part, takes pains to dispute whether its staff saw such symptoms. Despite the Parties' intense focus on this dispute, Plaintiffs do not contend that methadone withdrawal *caused* White's death. (*See* Doc. 76, at 12; *see generally* Docs. 76, 78, 84.) Nonetheless, to provide context, the Court will discuss evidence relating to this factual dispute and comparable ones in the remainder of this background section and will consider the extent of their doctrinal implications in due course.

### A. The Silverdale Facility and Relevant County Policies

The Parties agree that the County assumed control of the Silverdale facility on December 31, 2020. (*See* Doc. 17, at 6.) Over the next six months, the County transferred inmates and operations, including booking operations, over to Silverdale from a separate facility long known as the "Hamilton County Jail." (*See id.*; Doc. 78, at 9; Doc. 81, at 6.) Plaintiffs represent, and the County does not dispute, that QCHC was not the County's medical provider when it operated the Hamilton County Jail. (*See* Doc. 78, at 9; Doc. 81, at 6.) But the parties do not dispute that, at all times relevant to this litigation, the County contracted with QCHC in lieu of employing medical staff. (*See* Doc. 78, at 9; Doc. 81, at 6.)

A section of the Hamilton County Sheriff's Office policies, 90.04 *Physical Plant*, contains references to the Hamilton County Jail, as well as detailed descriptions of its physical contents and layout. (*See* Doc. 80, at 94–109.) Other sections of the County policies in the record appear to date to this pre-Silverdale period, including Section 90.05 *Admission, Records, and Release*, which provides, inter alia, procedures for how corrections staff should conduct bookings and handle inmates' property, including medications brought into jail. (*See id.* at 75–93.) This policy appears to refer to specific locations within the Hamilton County Jail. (*See id.*

at 85.) The policy also provides it is to be "reviewed annually by the Chief of Corrections." (*Id.* at 93.) The copy of Section 90.05 in the record, however, indicates it was approved on May 16, 2017, and lists a "Review Date" of May 9, 2019. (*See id.* at 75.)

The County's policies also contain various provisions governing the handling of outside medications, including the following:

- Section 90.05.02 *Property Retrieval, Storage, Return, and Disposal*: "Inmates who arrive with any type of medication will relinquish it to the arresting officer who will list it on the property form in the 'medications received' section. . . . Authorized medications will be placed inside the inmate's property bag or released to medical personnel by intake personnel." (*Id.* at 77 ("Review Date: 05/09/2019").)

- Section 90.05.07 *Booking Records*: "Medications will be listed on the Property Receipt and forwarded to the jail clinic." (*Id.* at 88 ("Review Date: 05/15/2019").)

- Section 90.09.32 *Receiving Screening*: "All intake forms, (medical or mental health) along with any medications turned in by incoming inmates, will be turned in to the medical clinic. Medications may be placed in the medication safe located in the Booking area. At the time of placing these items in the safe, the intake officer will notify medical of the items placed there." (Doc. 51, at 90 ("Review Date: 12/05/2019").)

- Section 90.09.45 *Pharmaceuticals*: "Medical staff will be notified when non-scheduled medications are taken in booking from inmates or brought to jail by families. Medical staff will review and verify medications that arrive in intake and non-scheduled medications will be placed in the inmate's property." (*Id.* at 137 ("Review Date: 10/18/2020").)

- Section 90.09.46 *Inmate Medications Brought from Home*: "All medication in [the] possession of an inmate at the time of intake will be taken and the identification of and the need for such medication shall be verified before it is administered. . . . Female inmate's medication should be placed in property bags, unless they are narcotics, to ensure that medications are taken with the inmate during transfer to Silverdale. . . . Notation of an inmate's name, medications, current Rx, along with date and nurse's signature will be made on the Home Medication Form. . . . This policy is reviewed annually by the Chief of Corrections and Medical Director." (Doc. 51, at 13; Doc. 52, at 5 ("Review Date: 02/24/2019").)

Like the booking policies discussed above, these policies indicate they are to be "reviewed annually by the Chief of Corrections and Medical Director." (Doc. 51, at 90; Doc. 52, at 5.) Although these policies all list review dates that predate the move to Silverdale,[3] the County represents that its policies and procedures "regarding handling outside medications" apply to Silverdale just "as much as they did when inmates were held downtown." (Doc. 81, at 6.)

Additionally, in the deposition of Chief of Corrections Shaun Kevin Shepherd, this exchange occurred regarding the County's outside medication policies:

> Q: . . . "Inmates are generally not allowed to bring in medication"—"to bring medication into the jail from the outside."[4] Can you tell me off the top of your head sort of generally what that policy is?
>
> A: Yes. It's a policy and also the TCI standard that we immediately take medications from an inmates or arrestees and secure that medication [sic], and then we're allowed to—we don't administer any medications whatsoever, as far as from the jail's perspective or sheriff's office.
>
> Q: That is handled solely by the medical provider?
>
> A: Correct. And that's prescribed medications.

(Doc. 80, at 68.)

The Parties do not dispute that the County's "policies regarding medical treatment . . . for inmates comprises [sic] approximately one-third (1/3) of its overall policies and procedures."

---

[3] Note, however, that Section 90.09.46—despite listing a review date of February 24, 2019—refers expressly to Silverdale. (*See* Doc. 51, at 13; Doc. 52, at 5 ("Female inmate's medication should be placed in property bags, unless they are narcotics, to ensure that medications are taken with the inmate during transfer to Silverdale").)

[4] Since the page preceding this exchange in the deposition transcript is not included in the record, the Court cannot tell what document counsel is quoting.

(*See* Doc. 65, at 1; Doc. 79, at 2.)[5]  Plaintiffs and the County dispute whether the County's

medical-treatment policies "are comprehensive and meet or exceed the requirements of the

Tennessee Corrections Institute." (*See* Doc. 65, at 1; Doc. 79, at 2.)[6]

### B.    White's Arrival at Silverdale

According to White's mother-in-law, Donna White, White called her on May 11 from

Silverdale and stated she had not yet received her medications.  (*See* Doc. 80 at 24.)  On May 12,

2025, at 8:00 AM, White was booked.  (*See id.* at 26.)  Silverdale shift briefs indicate at least

some medical staff was present in the booking area on May 11 and 12.  (*See* Doc. 52, at 124–45.)

Plaintiffs contend that Silverdale did not perform a drug screen as part of White's intake.[7]  In a

---

[5] Plaintiffs do not dispute this figure; however, they contend "the policies reference a prior healthcare provider, Erlanger Hospital[,] and pertain solely to the downtown jail which did not house female inmates." (Doc. 79, at 2.)

In support of this figure, the County cites the declaration of Rodney Terrell (Doc. 51, at 6), which Plaintiffs have moved to strike (*see* Doc. 75); the County also cites generally to the copies of its policies appearing in the record (Doc. 51, at 11–139; Doc. 52, at 5–120), the admissibility of which are not in dispute.

[6] Plaintiffs dispute this representation on the ground that the policies "have not been updated since the Hamilton County Jail contracted with QCHC, moved entirely to Silverdale, and started housing women inmates." (Doc. 79, at 2.)

Plaintiffs and the County also dispute whether Silverdale has "failed any TCI inspections due to medical-related, or any other, issues." (*See* Doc. 65, at 1; Doc. 79, at 2.)  Plaintiffs cite to this statement by Dr. Bates in his deposition regarding TCI inspections:  "Sometimes we pass and the jail fails and sometimes—I think there's only one time where we failed—or got a remediation and eventually passed, but you can fail medical as well." (Doc. 80, at 14.)

[7] Plaintiffs cite to a deposition of Defendant Watson in support of this contention (*see* Doc. 76, at 3 (citing Doc. 80, at 34)); however, the cited lines of this deposition include only the following exchange:

Q:    If Ms. White was drug screened when she came into Silverdale, would the results of that drug screen be in her medical records?

A:    Yes.

Q:    So if there's not a drug screen in her medical records, any idea why?

A:    No.

recorded phone call that Plaintiffs represent White placed to her mother-in-law from Silverdale on May 12,[8] a woman can be heard saying, "[t]hey're not giving me my medication down here. They are flat ass refusing, they won't even talk to me about it, or nothing.  They say there's no nurses here, and they've been saying it ever since I got here."  (Doc. 74, at 0:33–46.)

A record titled "Report - Inmates Request History Detail" shows that White put in a request at Kiosk A4-2 on May 13 at 10:42 AM, which read in full, "i [sic] need my account unlocked"; the same record indicates this request was resolved as of May 19 (after her death) with the note, "You do not have any holds on your account."  (Doc. 52, at 121.)  The record does not reflect any further kiosk requests.  (*See* Doc. 52, at 122–23.)

In the early afternoon of May 13, according to records time-stamped 12:53 through 1:03 PM, Nurse Kayla Swafford performed a booking screening of White.  (*See* Doc. 49, at 52–57.) As part of this screening, Swafford asked White a series of questions and noted her responses, in relevant part, as follows:

> Do you have any medical conditions that need to be addressed?:
> 　　　Yes
> Do you have any mental health conditions that need to be addressed?:
> 　　　Yes
> Do you take any prescription medications on a daily basis?:
> 　　　Yes
> . . .
> Have you ever experienced withdrawal from alcohol or other drugs?:
> 　　　No

_____

(Doc. 80, at 34.)  Based on this cited excerpt, the Court cannot conclude that White was not drug screened, nor even that there was no drug screen reflected in her medical records.  (*See id.*)

[8] The Court is unable to discern precisely when this phone call took place.  Plaintiffs' briefs state it was on May 12, but Donna White's affidavit makes no mention of a call on May 12—even though it does describe a May 11 call and states that White attempted to call her twice on May 13 (but both of those calls disconnected).  (*See* Doc. 76, at 3; Doc. 78, at 2; Doc. 80, at 24.)

(*Id.* at 54.)  In a declaration, Swafford averred she is "trained to recognize the symptoms of withdrawal from drugs and alcohol."  (*Id.* at 72.)  She further recalled that White "did not show any signs of withdrawal or distress during her booking screening," "did not have any objective symptoms to suggest she needed emergent medical care for any condition," and generally "presented normally and appropriately."  (*Id.*)

These records list the Requesting Provider as Defendant (and Nurse Practitioner) Graves, and they reflect that Graves ordered prescriptions, "to continue home medications," of the divalproex and the levothyroxine (both in White's normal doses).[9]  (*See* Doc. 49, at 54, 56–57; *see also id.* at 133–35.)  These records show the "Requested Start Date" and "Actual Start Date" for the divalproex was May 14; for the levothyroxine, however, the same dates are not specified (they read "05-1 -2022," with a blank space after the "1").  (*Id.* at 56–57.)  Finally, the first page of the screening records indicates an instruction to "Perform Intake Health Assessment within 24 hours," with a "Requested Start Date" of May 13 and "Requested End Date" of May 14; Plaintiffs contend (and QCHC does not dispute) that this meant Graves ordered an *additional* health screening of White that was never performed.  (*Id.* at 52; *see* Doc. 76, at 4; Doc. 85, at 2.)

### C.  QCHC's Administration of White's Medications

In her deposition, Defendant Durham, a Licensed Practical Nurse, explained the procedure QCHC uses to administer medications at Silverdale, known as "pill pass" or "pill call."  (Doc. 49, at 73–80.)  In preparation for pill pass, a nurse performs the following tasks:  (a) consult a patient's Medication Administration Record ("MAR") to verify her medications and

---

[9] Graves testified that she did not order White's third medication, the hydroxyzine that she had taken for sleep, because "[h]ydroxyzine is a medication that is used to treat symptoms.  It doesn't treat an underlying disease.  It's a medication that can be highly abused in our setting, so it's not routinely prescribed. . . . People can hoard it and take larger doses and it can cause euphoria."  (*Id.* at 135.)

dosages; (b) write the patient's name, inmate number, and date of birth on an individual pill envelope; (c) obtain a pre-packaged blister pack (sent to Silverdale from the pharmacy) with the patient's medication; and (d) remove the patient's medication from the blister pack and put in her individually marked envelope. (*See id.* at 75–76.) Durham explained that different nurses have their own preferred methods for how to secure the envelopes once the above steps have been completed, but her method is to secure each individual envelope with a safety pin, then place a binder clip around a group of envelopes (thus allowing her to organize the groups by unit). (*See id.* at 76.) At pill pass, a nurse's encounter with each patient proceeds as follows: (1) the patient identifies herself, and the nurse consults either an accompanying corrections officer[10] or a computer to verify her identity; (2) the nurse then administers the medication "as directed on the MAR" by handing it to the patient, along with some water; (3) after the patient receives the medication, she is to swallow it immediately; and finally, (4) the patient's mouth is "checked" to make sure she has taken the medication, and she is excused from the pill line. (*See id.* at 74.) "[A]s a general practice," after each unit of patients receives medication, nurses record who received which medications in patients' individual MARs on a nearby computer. (*Id.* at 77.)

On the bottom of each MAR, there is a series of six yes-or-no questions (the "Verification Questions"):

> User Verified?
> Medication Verified?
> Patient Verified?
> Patient Signature?
> User Signature?
> Witness Signature?

---

[10] Defendant Durham stated she "would refuse to do" pill pass without a corrections officer present; she was not able to confirm whether the same was true of other nurses. (*Id.* at 78.)

(*See id.* at 46–51.)  If a user inputs "No" to any of these questions, the MAR appears to provide a space to indicate why a user, medication, or patient was "Was NOT Verified," or a signature "Was NOT Obtained."  (*Id.* (emphases in originals).)

According to the MARs in the record for White, the following occurred at pill pass on May 14 through 16[11]:  On the morning of May 14, sometime prior to 9:30 AM, White received her divalproex (this is the earliest record of her receiving any of her medications at Silverdale); she did not receive levothyroxine, however, because it was "On Order From Pharmac [sic]."  (*Id.* at 50–51.)  During the morning of May 15, prior to 9:46 AM, she again received the divalproex but not the Levothyroxine.  (*See id.* at 48–49.)  On the morning of May 16, prior to 10:33 AM,[12] she received the divalproex and, for the first time at Silverdale, the levothyroxine.  (*See* Doc. 49, at 46–47.)  On each of the MARs in White's record, all six of the Verification Questions were marked "No," but no explanation was provided.  (*See id.* at 46–51.)

In addition, testimony from Defendants Durham (who worked pill pass on May 14 and 15) and Watson (who worked pill pass on May 16) include the following recollections of their interactions with White on those three days:  Durham recalled that, on May 14, White appeared "agitated" in response to not receiving her levothyroxine; Durham, having recalled speaking with her specifically, assured White that she'd "do everything in [her] power to try" to obtain the levothyroxine "as quickly as possible."  (*Id.* at 81.)  Immediately after this interaction, Durham

---

[11] The record includes a total of six MARs for these three days:  one for each medication on each day.  (*See* Doc. 49, at 46–51.)

[12] The times provided in this paragraph indicate when each corresponding MAR was "Last Modified," meaning they indicate when, on each day, the nurse working pill pass would have completed White's MARs after administering her medication; each MAR also notes the time it was "Created."  (*See id.* at 77.)  In a deposition of Defendant Erica Watson, who worked pill pass on May 16, she explained she would have administered White's medication closer to the "Last Modified" (10:33 AM) than the "Created" time (6:38 AM).  (*See* Doc. 80, at 31.)

went to the property room to try to locate the levothyroxine White brought with her to Silverdale but, she explained, "I checked Mrs. White's purse where she told me the medications would be, and it was not in the purse." (*Id.* at 82.) Durham then "follow[ed] up [to] make sure that the medication was ordered from the pharmacy."[13] (*Id.* at 83.) When she then saw White on May 15 for pill pass, Durham relayed that she was unable to find the medications in the purse and, in turn, observed of White's response that "she was annoyed" but "wasn't ugly or out of the way or snappy or anything." (*Id.* at 84.) Further, in response to an interrogatory that reads, "For each instance that you interacted with Carol Rene White, describe in detail her physical appearance, current health status, and your opinion of her overall well-being," Durham stated, "Her physical appearance was appropriate. She did not appear to be in any physical distress." (*Id.* at 87.) Finally, as to May 16, Watson stated in response to an interrogatory identical to the one posed to Durham,

> I recall that when I delivered medications, she was happy to be receiving them and thankful. She was able to ambulate to come and get medications. She may have appeared a little under the weather (tired) but it did not appear to me that she was in need of any additional immediate treatment.

(*Id.* at 111.)

Further, in a deposition of Watson, Plaintiffs' counsel questioned her regarding her pill pass practices and her recollections of May 16. (*See* Doc. 80, at 27–39.) When counsel presented her with a copy of one of the May 16 MARs, with the Verification Questions all marked "No," Watson testified as follows:

---

[13] It is unclear what specific steps Durham took to "follow up." QCHC represents that "Durham called the pharmacy and confirmed that the medication had been ordered" (Doc. 58, at 5), but the record instead indicates that Durham did *not* call the pharmacy: as she immediately went on to explain, "If I had any concerns that maybe it had been ordered and it should have been there by now I *would* have called the pharmacy, but I don't remember that being a concern." (Doc. 49, at 83–84 (emphasis added).)

Q:     Okay.  Let's talk about these questions.  It says: "User Verified:  No."  Do you see that?

A:     Yes.

Q:     "Reason User was not Verified," and it's not filled out.  Tell me about that.

A:     I've never seen this.

Q:     Never seen those questions?

A:     It's not—I've not seen it in this form.

Q:     So what is it that you are filling out on your end?

A:     Her name comes up . . . and our—our medication administration log comes up, each order, for each individual person.

Q:     And let's back up.  What is it physically that you're looking at to fill out?

A:     My computer. . . .  When I click her name . . . it brings up a list of medicines that she is to receive that day, that shift, because the shifts are separate. . . . I pull her medications based on what she's ordered.  I don't answer these questions.  I don't clink anything to answer all these.

Q:     So, once she's given that medication, is there any sort of way to close out that screen?

A:     When you confirm that they received or did not receive their medicine, it closes the screen.

Q:     So there's no method by which these questions get prompted to you.

A:     No.

(*Id.* at 31–33.)[14]  Later, Watson explained she had two alternate methods of managing the

logistics of pill pass:  in one, she would have a cart with her, which allowed her to (a) store the

envelopes containing patients' medications on the cart and (b) take her laptop, which she used to

_____

[14] In reference to this exchange, Plaintiffs and QCHC dispute whether QCHC had a "method by which its medical practitioners during pill pass can . . . document properly that the correct medication is being provided to the correct inmate."  (Doc. 76, at 5; *see* Doc. 85, at 2–3.)

complete patients' MARs, with her during pill pass; in the other, when she did not have her cart, she would (a) carry the envelopes, secured with rubber bands, by hand and (b) after finishing a group of patients (which typically took around thirty minutes), she would return to her laptop and complete the MARs, verifying which patients took their medications "by the envelopes that still have pills remaining in them." (*See id.* at 33, 35–39.) When asked about her process on the morning of May 16, she stated, "I do not remember if I had my cart. Based on these times, I did not have my cart right there." (*Id.* at 33.) Further, on cross-examination, in reference to an earlier exchange in which Plaintiffs' counsel had asked her whether divalproex and olanzapine are "similar" medications, Watson explained, "[t]hey're both mental-health—used to treat mental health" and, when asked whether they "look the same," answered "No." (*Id.* at 36; *see id.* at 34.)

### D.     White's Death

At 2:02 PM on May 16, according to White's medical records, medical staff was called to Silverdale unit Alpha 4 to attend to an "unresponsive inmate." (Doc. 49, at 40.) A 911 call was placed from Silverdale at 2:04 PM, and White was subsequently loaded onto a stretcher and transported to Erlanger Hospital, leaving Silverdale at 2:33 PM. (*See id.* at 42; 65.) The Hamilton County Medical Examiner's autopsy report indicates that, in the time immediately before White was transported to Erlanger Hospital, "Silverdale staff administered Narcan x3, AED shocked her x7, and initiated CPR." (*Id.* at 65.) White was then pronounced dead upon arrival, with her time of death listed as 3:08 PM. (*Id.*) The autopsy report characterizes her death as an "accident" caused by "Combined toxicity, methadone and olanzapine," and elaborates that "[o]lanzapine would have enhanced the effect of the methadone due to the QTc-prolonging effect of both drugs, also by the CNS-depressing effect of both drugs." (*Id.* at 67.)

White's medical records do not indicate that she was prescribed or given either methadone or olanzapine while at Silverdale.  (*See id.* at 46–51, 54, 56–57.)  In Defendant Graves's deposition, she confirmed that QCHC prescribes olanzapine (under its brand name, Zyprexa), that olanzapine is an antipsychotic drug, and that to her knowledge it is not "a street drug."  (*See* Doc. 80, at 49.)  QCHC CEO Dr. Bates, when asked in his deposition whether "olanzapine [is] a street drug," had this to say:  "No.  But in jails inmates, for some reason, think it helps them sleep.  So it's not uncommon for inmates to actually come in and ask for olanzapine."  (*Id.* at 17.)

A section of QCHC's policies entitled "Procedure in the Event of a Patient Death – J-A-10" provides, inter alia, that a "mortality review" should be performed within 30 days of a patient death, which includes an "administrative review" ("[a]n assessment of correctional and emergency response actions surrounding an inmate's death) and a "clinical mortality review" ("[a]n assessment of the clinical care provided in the circumstances leading up to a death").  (*Id.* at 59–60.)  The policy further provides that both the administrative and clinical mortality reviews are intended to "identify areas" where QCHC's operations, patient care, policies, or procedures "can be improved."  (*Id.*)  In his deposition, Bates stated there was no "administrative review" conducted of White's death "[t]o my knowledge" and, when asked why, responded, "[w]e didn't actually have a mortality review committee meeting about this death because we felt pretty strongly that we knew what happened here and why it happened . . . [f]rom the toxicology and autopsy report."  (*Id.* at 16.)

Counsel also asked Bates whether he interviewed Watson as part of his clinical mortality review, and he replied, "I [didn't] have to because it's documented in the chart."  (*Id.* at 18.)  He further stated that he did not interview "any of the inmates that were within [White's] cell or

pod," nor did he interview "the sheriff's deputy that went with the nurse for pill pass that morning." (*Id.*) Plaintiffs' counsel then inquired further as to Watson's administration of White's medication on May 16:

> A: [W]e generally don't have a lot of problems with medication errors.
>
> Q: But you said earlier that you did not talk to [Watson] or conduct an administrative review in this case, correct?
>
> A: I did not talk to her, no.
>
> Q: Okay. So she can't—you don't know whether . . . the patient was verified.
>
> A: No, I don't.
>
> Q: You don't know that the medication was verified?
>
> A: Well, the medication would have been verified, because it would have been on a blister card. I don't know how she would verify it other than that.
>
> Q: Well, and if her testimony is correct, that she walked around with a bunch of envelopes instead of a medication cart, then we may have reason to doubt even that the medication was verified, correct? . . .
>
> A: I mean, I guess you could say that, but she would have had to have got the medication out of the cart to put in an envelope.

(*Id.* at 19–20.)[15]

A separate investigation into White's death was allegedly performed by County "Detective Brenda Short."[16] The record includes notes from interviews of two other inmates

---

[15] This exchange took place over objections by QCHC's counsel. (*See id.*)

[16] Plaintiffs refer in their response brief to both a "Detective Brenda Short" and an "Inv. Short." (*See* Doc. 76, at 6–7.) It is unclear whether Detective Short and Investigator Short are the same person, particularly because Plaintiffs' representations about "Inv. Short" cite to a deposition of one "Georgia Denise Short." (*See* Doc. 80, at 52.) Since it is sufficiently clear, at minimum, that both "Detective Short" and "Inv. Short" are Hamilton County employees, it is immaterial whether they are one or two people for purposes of this motion.

dated May 16, at 3:49 PM, which Plaintiffs represent were conducted by Detective Short.[17] (*See* Doc. 80, at 41–43.) These notes provide the following additional context regarding White's death and the time proceeding it: Inmate Latasha Dawn Johnson relayed, inter alia, that White "had been off her psych meds for over a week and [had] been detoxing" and, in response to a question as to whether White "had got any dope," "Nope. I was directly behind her. The dope is in Alpha 1.[18] She didn't take anything." (*Id.* at 41–42.) The other inmate, Elizabeth Lamb, stated that she went to check on White because "she was lying at an angle," and that she then pulled White's "blanket down and noticed she was blue and purple on her lips." (*Id.* at 42.) Lamb had last seen White "up and moving" on May 15, and when asked whether she noticed "any kind of physical symptoms from her yesterday [the 15th]," Lamb reported that White "wasn't herself like she was spaced out. . . . Yesterday, she didn't really understand or comprehend. Like she wasn't really there." (*Id.*) Furthermore, when Lamb stated she knew White had been detoxing from methadone, Short asked "Did she tell you that?," and Lamb responded, "Yes, I was supposed to have made her a pillow so she could lay her head on." (*Id.*)

At her deposition, Investigator Short stated that she was familiar with methadone but not olanzapine and that, once she received the autopsy report, she took no further actions to investigate White's death because "[t]hat was the cause of death, so I didn't do anything else with that." (*Id.* at 55–56.) Short also responded "No" to both of the following questions: "And

---

[17] Although this fact is undisputed, the copy of the notes that appears on the record does not include the full name or professional affiliation of "Detective Brenda Short" (thus adding to the uncertainty described in the previous note). (*See* Doc. 80, at 41–43.) In addition, based on these notes, it appears the interview questions were asked by both Short and another person named Langford (both identified only be last name). (*See id.*)

[18] Recall that, at least as of May 16, White was in Alpha 4. (*See* Doc. 49, at 40.)

did you do any investigation to see if there was methadone in the jail that she could have gotten?" and "Did you follow up with any of the other inmates at all?"  (*Id.* at 57.)

## E.    QCHC's Training

During her deposition, Defendant Watson was presented with a document indicating she completed QCHC's "CorrecTek Essentials MAR – Accessing the MAR lesson" training as of November 11, 2022[19]; she did not recall whether she completed this training prior to that date. (*See* Doc. 80, at 28–29.)  Counsel also questioned Watson regarding her knowledge of QCHC's "Continuity of Medication" policy, which provides, inter alia, procedures staff should follow when an inmate arrives with prescription medications in her possession:

> Q:    Okay.  Do you know the procedure for Silverdale's—I guess it's more for QCHC—for inmates that have or bring in prescriptions that they're on with them to jail?
>
> A:    We do not give meds from a person.
>
> Q:    Do you do anything with them?
>
> A:    They're put in their property.
>
> Q:    Okay.  Do you do anything with them before they're put in property?
>
> A:    No.
>
> Q:    Okay.  If you'll look down at "Procedure" in that policy.  The procedure, according to QCHC, for that—it says:  "Any prescribed medications the patient has on his or her person during the intake booking process shall be reviewed by healthcare personnel."  Were you aware that this policy existed?
>
> A:    I don't do medical intakes—
>
> Q:    Okay.

_____

[19] Plaintiffs do not provide the original document (*see generally* Doc. 80); the Court infers it provides this date based on the deposition transcript.  (*See id.* at 29.)

A:       —so the nurse that does their intake would do . . .[20]

(*Id.* at 30; *see id.* at 62–63.)[21]

QCHC does not cite to any training materials, training policies, or evidence otherwise purporting to demonstrate training received by its employees regarding their administration of medical care at Silverdale. (*See generally* Docs. 56, 84, 85.)[22]

## F.      Hamilton County's Training

The County submitted 138 pages of County training materials, including PowerPoint presentations and lesson plans. (*See* Doc. 54, at 3–141.)[23] These presentations include slides

---

[20] Because this is the end of the transcript page and Plaintiffs did not submit the following page, the Court is not privy to what Watson may have said next about nurses who perform intakes.

[21] In the argument section of Plaintiffs' opposition brief, they assert further that "Ms. Watson was unfamiliar with the policies for the procedure following an inmate death . . . and the policy that mandates training in learning signs of hoarding medications among inmates." (*Id.* at 10.) In support of this proposition, however, Plaintiffs cite only the section of QCHC's policies containing the Continuity of Medication policy. (*See id.*) They do not cite to any evidence in the record regarding Watson's knowledge or lack thereof of these policies, and the portions of Watson's deposition transcript Plaintiffs provide (and cite elsewhere) appears to be lacking any discussion of the procedures "following an inmate death" or "learning signs of hoarding medication among inmates." (*See id.*; *see also id.* at 4–7 (discussing Watson in Plaintiffs' fact section).) Thus, Plaintiffs have failed to cite to any evidence in the record supporting their contention that Watson was unfamiliar with these additional policies.

[22] QCHC appears to rely instead on statements made by an expert for Plaintiffs, Jenelle Lea, MBA, BSN, RN, CEN. (*See* Doc. 58, at 7–9.) Citing to various portions of Lea's deposition (*see* Doc. 49, at 139–86), QCHC construes her opinions as demonstrating generally that its medical staff members were not at fault. (*See* Doc. 58, at 7–8 ("Mrs. Lea had no criticisms of the initial booking screening nurse, Kayla Swafford"; "Mrs. Lea could not find fault with Ms. Durham's medical treatment of White"; "Mrs. Lea testified that Ms. Watson's medical care was appropriate provided there was no evidence that Mrs. White was having problems when she spoke to Ms. Watson and she evaluated her at pill pass on May 16").)

[23] Plaintiffs contend these materials are "immaterial" because they include "lesson plans submitted after May 16, 2022 and are, thus, not material to this case." (Doc. 79, at 4.) However, it is not so clear that these materials are unrelated to the issues at hand. Many of the lesson plans appear to be sample lesson plans submitted to the Tennessee Corrections Institute ("TCI"), and they list both when they were prepared and when they were submitted. (*See generally* Doc. 54, at 3–141.) For example, a lesson plan for a course titled "2023 Hamilton County Sheriff's Office

containing information on "TCI Minimum Standards and Accreditation." (*See id.* at 27.)
According to Richard Womack, a Sergeant employed by the Hamilton County Sheriff's Office,
"Corrections Deputies are required to undergo pre-service training," which "consists of . . .
classroom instruction in addition to self-study," before working at Silverdale. (Doc. 52, at
146.)[24] Womack further states the following facts regarding pre-service training: since 2016,
"new corrections deputies have received 240 hours of pre-service training"[25]; as of January 2022,
they received 260 hours; as of January 2024, that number has grown to 292 hours, including an
addition 16 hours of "instruction related to booking"; "Corrections Deputies also receive at least
48 hours of additional formal training annually"; new Correction Deputies "who had previously
worked at Silverdale as guards" were required to undergo the same training process as if they
had no correctional experience; that this training "includes instruction as to how to address
medical complaints by detainees and inmates, obvious medical needs regardless of any

---

Corrections Pre-Service Academy- Intake and Receiving Screening" indicates that it as
"Prepared by: Lt. Mike McGowan" on February 3, 2022 (which was three months prior to the
events at issue in this case), and "Submitted by" McGowan on January 4, 2023. (*Id.* at 37.) In
the absence of further evidence demonstrating otherwise (for example, evidence suggesting that
lesson plans had to be submitted to and approved by the TCI *prior* to being used for training), it
is plausible that this lesson plan was used—or at least bears some resemblance to one that was
used—prior to May 16, 2022 (particularly given the "Prepared" date of February 3, 2022).

Additionally, Womack states, "Some of the reference Exhibits are from the 2023 training
sessions; however, they accurately represent the training that was given prior to 2023." (*Id.* at
149.)

[24] Although Plaintiffs move to strike the declaration of Richard Womack, they do not dispute
these facts. (*See* Doc. 79, at 2.)

[25] Plaintiffs dispute this fact on the ground that Deputy Chief of Corrections Shaun Kevin
Shepherd stated, in deposition, that he did not "undergo any specific additional training" upon
being promoted to that position, when he had previously served as a captain, and added that he
"met the minimum qualifications for the position as it was posted." (Doc. 80, at 65–66.)
Shepherd went on to state of his ongoing annual training, "I still do my 40 hours of POST
certification. I'm still a POST certified officer for the state. So I actually attend 56 hours at a
minimum, if not more, annually." (*Id.* at 67.)

complaint, and medical emergencies"[26]; and that "[o]nce new deputies complete the training academy, they are assigned a mentor whom they shadow and continue on-the-job training . . . until they are determined by supervisory staff to have sufficient experience to work independently." (*Id.* at 147–48.)

As to how the County's training incorporates its written policies, Womack states the following [27]: new deputies are required to review all policies through a computer program called "PowerDMS"; "deputies are required to read [each] policy and indicate that he or she has read and understood the policy"; the policies are then made "available for deputies to review at any time"; when a policy is updated, all deputies must review the updated policy on PowerDMS within a prescribed amount of time; and that if a deputy fails to review an updated policy, the deputy will receive an automated reminder, then supervisors will be alerted, and disciplinary action may eventually result. (*Id.*)

In addition, Rodney Terrell,[28] a County Captain of Corrections, avers as follows: "corrections deputies are trained to recognize when someone appears to need medical assistance, to the extent . . . able to be discerned by person with the most basic first responder training"; deputies are trained to contact QCHC "[f]or medical care that appears more urgent"; "[f]or emergency medical situations, deputies are trained to contact medical for immediate medical response as well as to contact 911 for ambulance transport if the circumstances appear to be of

---

[26] Plaintiffs dispute the scope of pre-service medical training, citing an exchange from Shepherd's deposition in which he is asked, "Are the correctional staff trained in health related matters at all?" and responds that "[t]hey're trained in first aid." (Doc. 80, at 69.)

[27] Plaintiffs do not dispute any of the following facts; however, in response to each one, they object, "this is immaterial because the policies are effectively out of date. They reference a completely different healthcare provider, a different building, and do not provide for female inmate care." (Doc. 79, at 3–4.)

[28] Plaintiffs move to strike this declaration. (Doc. 75.)

such a nature to require hospital evaluation and/or treatment"; in circumstances where "they cannot gauge the extent of the medical need," deputies may "wait for direction from medical staff before calling 911"; and that "[w]hile corrections deputies are trained in basic first aid, they are not medical providers." (Doc. 51 at 6–7.)[29]

### G.    The Claims at Issue

Plaintiffs assert the following claims:  (1) violation of White's Eighth Amendment rights under 42 U.S.C. § 1983 against all defendants; (2) a *Monell* claim under § 1983 against the County, Sherriff Hammond, and QCHC; (3) violations of Article 1, §§ 16 and 32 of the Tennessee state constitution against all defendants; (4) negligence per se against the County and Hammond; (5) negligence against the County and Hammond; (6) wrongful death against all defendants, and (7) loss of consortium, on behalf of James Christopher White, against all defendants.  (*See* Doc. 1, at 16–30.)  Plaintiffs seek compensatory and punitive damages, as well as attorneys' fees pursuant to 42 U.S.C. § 1988.  (*Id.* at 30–31.)  All defendants move for summary judgment on all claims.

## II.    STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*,

---

[29] The County also cites to facts in the record regarding how training for "civilians employed or volunteering at the jail" differs from training for corrections deputies.  (*See* Doc. 65, at 4.)  The Court does not see reason to elaborate on these facts and representations because Plaintiffs do not contend that any "civilian ever came into contact with Carol White."  (Doc. 79, at 5.)

253 F.3d 900, 907 (6th Cir. 2001).

The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The moving party may meet this burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact or by pointing out the absence of support in the record for the nonmoving party's case. *Celotex*, 477 U.S. at 325. Once the movant has discharged this burden, the nonmoving party can no longer rest upon the allegations in the pleadings; rather, it must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).

At summary judgment, the Court may not weigh the evidence; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the non-movant based on the record. *Id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If not, the Court must grant summary judgment. *Celotex*, 477 U.S. at 323.

## II.        HAMILTON COUNTY'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs bring claims against the County for (1) violation of White's Eighth Amendment rights under 42 U.S.C. § 1983, (2) *Monell* liability pursuant to the Eighth Amendment violation under § 1983, (3) violations of Article 1, §§ 16 and 32 of the Tennessee state constitution, (4) negligence per se, (5) negligence, (6) wrongful death, and (7) loss of consortium. (*See* Doc. 1, at 16–30.) The County moves for summary judgment on all claims. (Doc. 59.)

## A.      Federal Constitutional Claims Against the County

"Prisoners have a general right to medical care based on the Eighth Amendment, which requires that prison officials may not be deliberately indifferent to their prisoners' serious medical needs." *Graham v. Moshailk*, 25 F. App'x 277, 279 (6th Cir. 2001) (citing *Estelle v. Gamble*, 429 U.S. 97, 104–06 (1976)).  To prevail on an Eighth Amendment claim, a prisoner must demonstrate "objective and subjective components":  (1) the objective component "requires a plaintiff to prove that the alleged deprivation of medical care was serious enough to violate the Constitution," and (2) the subjective component "addresses the officials' state of mind and requires a plaintiff to show that a defendant knew of and disregarded an excessive risk to inmate health or safety."  *Helphenstine v. Lewis Cnty., Kentucky*, 60 F.4th 305, 315 (6th Cir. 2023) (citing *Griffith v. Franklin Cnty.*, 975 F.3rd 554, 567 (6th Cir. 2020); *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)) (internal citations omitted; cleaned up).  For the subjective component, as the Supreme Court explained in *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  511 U.S. at 837.

Plaintiffs contend that the County's conduct at Silverdale violated White's Eighth Amendment rights (as incorporated against the state of Tennessee and its officials under the Fourteenth Amendment).  They bring their claims under 42 U.S.C. § 1983, which provides in relevant part,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any . . . person . . . to the deprivation of any rights . . . secured by the Constitution and laws [of the United States], shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

To succeed on a claim under § 1983, a plaintiff must show "(1) that he or she was deprived of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was

25

caused by a person acting under color of law." *Robertson v. Lucas*, 753 F.3d 606, 614 (6th Cir. 2014) (citations omitted). A local governmental entity is a "person" within the meaning of 42 U.S.C. § 1983 and, therefore, may be subject to liability for § 1983 claims.[30] *See Ford v. Cnty. of Grand Traverse*, 535 F.3d 483, 495 (6th Cir. 2008); *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690 (1978).

A municipal defendant, however, can be held liable under § 1983 only "if a custom, policy, or practice attributable to the municipality was the moving force behind the violation of the plaintiff's constitutional rights." *Gohl v. Livonia Pub. Schs. Sch. Dist.*, 836 F.3d 672, 685 (6th Cir. 2016) (quoting *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012)). "[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691 (emphasis in original). A municipality may be liable for a custom, policy, or practice under § 1983 pursuant to any of "four recognized theories: '(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.'" *Helphenstine*, 60 F.4th at 323 (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)). Therefore, for Plaintiffs' § 1983 claims against the County to survive summary judgment, there must be evidence from which a reasonable jury could conclude that the County had a custom, policy, or practice conforming to one of the above theories that was the moving force behind a violation of White's rights. *See id.*

---

[30] The County does not contest that it is a person within the meaning of § 1983; it contests only the first element listed above—that White "was deprived of a right secured by the Constitution."

Plaintiffs' arguments that the County is liable under § 1983 fall within two general theories: (1) that the County failed to train its officers pursuant to their constitutional duties, and (2) that the County "failed to properly investigate the death of Ms. White."[31] (*See* Doc. 78, at 7–13.) These theories sound necessarily in *Monell* liability and, therefore, the Court construes them as corresponding only with Count 2 of Plaintiffs' complaint (which pleads *Monell* liability) and *not* Count 1 (which pleads general violations of the Eighth and Fourteenth Amendments). (*See* Doc. 1, at 16–22.) In other words, the County cannot be liable for violating White's Eighth Amendment right to medical care *outside of* a specific *Monell* framework, because that would violate the bedrock principle that a municipality cannot be vicariously liable under § 1983. *See Monell*, 436 U.S. at 691.[32] Thus, at minimum, the County is entitled to summary judgment on Count 1.

### i. Failure to Train

To prevail on a failure-to-train claim under *Monell*, a plaintiff must show the failure is a result of the municipality's deliberate indifference, which the plaintiff may prove by showing either "(1) a 'pattern of similar constitutional violations by untrained employees' or (2) 'a single

---

[31] These are the theories Plaintiffs advance in their response brief. (*See generally* Doc. 78.) To the extent Plaintiffs contend they have alleged other theories of liability under § 1983, (*see* Doc. 1, at 18–20; Doc. 59, at 10), they have abandoned those theories of liability by not addressing them in their response brief. *See Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."); *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011) (holding that "[t]he district court properly declined to consider the merits of [the plaintiff's hostile work environment claim] because [the plaintiff] failed to address it . . . his response to the summary judgment motion").

[32] Additionally, although the Complaint pleads Count 1 against all defendants (*see* Doc. 1, at 16), Plaintiffs' response brief does not address how the County might be liable outside of a *Monell* framework; thus, while Plaintiffs' rationale for bringing Count 1 against the County is somewhat unclear, any non-*Monell* claims against the County have been abandoned. *See* supra note 35.

violation of federal rights, accompanied by a showing that [the municipality] has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation.'" *Helphenstine*, 60 F.4th at 323 (quoting *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 738–39 (6th Cir. 2015). Further, when a claim relies on a single violation, the plaintiff must satisfy three elements: "(1) that the County's 'training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury.'" *Id.* (quoting *Winkler v. Madison Cnty.*, 893 F.3d 877, 902 (6th Cir. 2018)). As to the crucial second element, the Supreme Court has suggested the "unconstitutional consequences of failing to train" should be "patently obvious" in order to evince a municipality's deliberate indifference under *Monell*. *Connick v. Thompson*, 563 U.S. 51, 64 (2011).

Plaintiffs argue the County "was deliberately indifferent because it failed to train its deputies on how to handle essential medication brought from an inmate." (Doc. 78, at 8.) Plaintiffs' arguments supporting this failure-to-train claim, though not entirely clear, are premised on a theory that the County's written policies are constitutionally inadequate in two key ways: (1) they were out of date and not tailored specifically to caring for women inmates in the facility where White was housed, and (2) they were inconsistent regarding the handling of medications inmates brought with them to jail. (*See* Doc. 78, at 9–10.) In advancing their failure-to-train arguments, furthermore, Plaintiffs do not contend that the County's conduct has previously resulted in a "pattern of similar constitutional violations by untrained employees"; thus, the Court must evaluate this failure-to-train claim according to the requirements summarized above for single-violation claims. *Helphenstine*, 60 F.4th at 323; (*see generally* Doc. 78).

"Regardless of the policy's content, simply the existence of an out-of-date written policy is insufficient to confer liability on [a municipality] for failure to train." *Sheeley v. City of Austin*, 2015 WL 3576115, *9 (D. Minn. June 5, 2015). Rather, there must be something about the circumstances of a case that makes the fact of a policy being out of date suggestive of deliberate indifference to constitutional rights. *See Scarlet Honolulu, Inc. v. Honolulu Liquor Comm'n*, 2023 WL 4968011, *11 (D. Haw. Aug. 3, 2023). The *Scarlet Honolulu* court, for instance, denied summary judgment on a failure-to-train claim when the training included "instruct[ing investigators] to independently . . . review an out-of-date binder of policies and procedures" and the court found, inter alia, that the municipality had "fail[ed] to provide training to its investigators on anti-discrimination and LGBTQ+ sensitivity." *Id.* at *6, *11; *see also Johnson v. City of Paterson*, 2022 WL 16570649, *5 (D.N.J. Nov. 1, 2022) (denying motion to dismiss when the plaintiff alleged a two-year audit of the municipality's police force "found that the Paterson department had *out of date procedures, command structure and policies*, including use of force and that the department has issues with training and needs to improve its use of force policies," which allegedly showed a pattern of violations by inadequately trained employees) (emphasis added).[33]

Here, viewing the record in the light most favorable to Plaintiffs, a reasonable jury could find that the County's written policies were out of date because: (1) the policies date to a time when the County operated a different facility, the Hamilton County Jail, and they reference that different facility; (2) many of the relevant policies list "Review Date[s]" in 2019 or 2020; and (3)

---

[33] *Johnson* is distinguishable from the instant case in that it was being considered on a motion to dismiss and the plaintiff's failure-to-train claim was premised on a pattern of violations by untrained officers (rather than a single incident); however, its reasoning is still instructive here insofar as it suggests the out-of-date training was inadequate not merely because it was out of date, but because it had already led to a pattern of violations. *See id.*

the policies also tend to provide they should be reviewed annually, meaning that their documented "Review Date[s]" (which were more than a year prior to the May 2022 events at issue in this litigation) suggest the County may have failed to update and review its policies in compliance with the annual-review provisions. (*See* Doc. 51, at 139; Doc. 52, at 5; Doc. 80, at 77, 85, 88, 93.) Based on this evidence, however, a reasonable jury could not *further* conclude that, as Plaintiffs urge, "the County [did] not have any actual policies and procedures that correspond to their **actual** healthcare provider at their **actual physical location**," or that the County had "no policy for specific healthcare to women inmates because the downtown jail never housed women inmates." (Doc. 78, at 9 (emphasis in original).) And a reasonable jury could not draw these further conclusions because the only evidence is inconsistent with such conclusions: at least one of the written policies Plaintiffs cite, Section 90.09.46 *Inmate Medications Brought from Home*, states expressly that "*Female inmate's medication* should be placed in property bags, unless they are narcotics, to ensure that medications are taken with the inmate during transfer to *Silverdale*"—despite listing a review date of February 24, 2019, nearly a year before the move to Silverdale began. (Doc. 51, at 139; Doc. 52, at 5 (emphasis added).) Even viewed in the light most favorable to Plaintiffs, then, the evidence on the record regarding the applicability of the County's policies to Silverdale suggests, at best, that the County may have done a lackluster job of updating its written policies (and their review dates) to suit its changing operations—*not that there were simply no written policies available* to inform its training of officers to care for female inmates at Silverdale. (*See id.*)

The Court agrees with the well-reasoned conclusions of other district courts that have found the mere fact of written policies being out of date is insufficient to support a failure-to-train claim. *See Sheeley*, 2015 WL 3576115 at *9; *Scarlet Honolulu*, 2023 WL 4968011 at *11;

*Johnson*, 2022 WL 16570649 at *5. Even assuming the use of out-of-date written policies renders training inadequate (the first element a plaintiff must show on a single-incident claim), a failure to update written policies does not make it "patently obvious" that a constitutional violation could result absent some additional facts suggesting the failure to update demonstrates deliberate indifference to constitutional rights (the second element). *Connick*, 563 U.S. at 64; *see Helphenstine*, 60 F.4th at 323; *Scarlet Honolulu*, 2023 WL 4968011 at *11. Here, Plaintiffs suggest the County's failure to update its written policies in compliance with its annual-review provisions renders its training inadequate because the resulting policies are insufficiently tailored to caring for female inmates at Silverdale. (*See* Doc. 78, at 9.) But Plaintiffs have cited no evidence to demonstrate (nor have they otherwise explained) *why* the County's failure to tailor its policies on "how to handle essential medication brought from an inmate" more specifically to gender and the physical location of its facility (factors that are not obviously related to the successful provision of gender-neutral medications) would pose a "patently obvious" risk to inmates' constitutional rights; this alone demonstrates that the staleness of the policies does not raise a genuine issue of material fact as to deliberate indifference. (*Id.* at 8); *Connick*, 563 U.S. at 64.[34]

Plaintiffs further argue that the County had "vastly inconsistent policies for how deputies are supposed to handle medications that inmates bring with them to jail." (Doc. 78, at 9.) Based on the written policies in the record, a reasonable jury could indeed find the policies are unclear, and in some instances even directly contradictory, regarding what correctional staff should do with medications brought from home, including with respect to (a) where such medications

---

[34] In addition, Plaintiffs have made no apparent effort to account for how the staleness of the written policies is *causally* connected to White's death (the third element of a single-violation claim). (*See generally* Doc. 78.)

should be stored, (b) whether and how medical staff should be notified about them, and (c) whether those *specific* brought-from-home medications (as opposed to identical medications ordered once an inmate arrives) should ultimately be administered at Silverdale. (*See* Doc. 80, at 77 ("Authorized medications will be placed inside the inmate's property bag or released to medical personnel by intake personnel"); *compare id.* at 88 ("Medications will be listed on the Property Receipt and forwarded to the jail clinic"), *and* Doc. 51, at 137 ("Medical staff will review and verify medications that arrive in intake and non-scheduled medications will be placed in the inmate's property"), *with* Doc. 51, at 90 ("Medications may be placed in the medication safe located in the Booking area").)

Yet however inadequate these policies were, there is no evidence that they are "the result of the [County's] deliberate indifference" and, moreover, there is no evidence that the ambiguities or inconsistences in the policies were "closely related to or actually caused" White's death. *Helphenstine*, 60 F.4th at 323. In *Helphenstine*, for instance, the Sixth Circuit found a reasonable jury could find deliberate indifference when the relevant training and policies were such that the municipality "effectively asked the jailers to make determinations about what constituted a medical emergency," despite such a task being "well outside their area of expertise." *Id.* at 325. In those circumstances, as the Sixth Circuit explained, correctional staff were clearly unprepared and unequipped to respond to medical emergencies, making it "patently obvious" that a constitutional violation could result—and in fact did result when a medical emergency led to the plaintiff's death. *Id.* (quoting *Connick*, 563 U.S. at 64). Here, though, the record demonstrates beyond dispute that Silverdale inmates could receive—and White did receive—medications while incarcerated (through the County's contract with QCHC), *regardless* of how outside medications were stored or handled. (*See* Doc. 49, at 46–51, 73–80.) In other

words, because White was given medications that were ordered newly from the pharmacy after her booking screening, rather than the medications she brought from home, the possibility that deputies may have been inadequately trained regarding how to store her outside medications is insufficient to show deliberate indifference as to the medical care she received. (*See id.*) Furthermore, consider what might have changed but for the claimed inadequacies in the County's policies: Had the policies clearly required deputies to deliver outside medications to medical personnel so that outside medications could be administered to inmates, White could have obtained her medication sooner, thus, Plaintiffs note, "prevent[ing] her delay of three (3) days in receiving her first dose of medication." (Doc. 78, at 11.) The problem here is that Plaintiffs do not contend, and they cite no evidence to show, that her death was the result of a *delay* in receiving medications—rather, Plaintiffs' contention is that White's death was ultimately caused by being given the *wrong medication* on May 16. (*See id.* at 11–12.)[35] As a result, a reasonable jury could not find the County's policies on handling outside medications, however inconsistent or flawed, caused White's death.[36] *See Helphenstine*, 60 F.4th at 323. The County is thus entitled to summary judgment on the failure-to-train claim.

---

[35] Further, even if the County's deputies had delivered White's medications to QCHC so that its medical staff administered those pills to her at Silverdale rather than identical pills they ordered from the pharmacy, it is not clear (and Plaintiffs cite no evidence to suggest) that Watson could not have still somehow mixed up the brought-from-home divalproex with olanzapine on May 16. (*See id.*; Doc. 76, at 5–6.)

[36] Finally, Plaintiffs also suggest deliberate indifference and causation were satisfied because of the email Judge Greenholtz's judicial assistant sent to the County regarding White's medications: "Every person that received that email was put on notice that White had medical issues that needed to be addressed when she was taken into custody. Instead of ensuring that those issues were addressed in an efficient manner, the insufficiently trained deputies failed to notify the appropriate medical personnel and White went without any medication until May 14th." (Doc. 78, at 11.) How the email from Judge Greenholtz's chambers fits into Plaintiffs' *Monell* argument regarding the County's training on handling outside medications is not clear, and the Court will discuss Judge Greenholtz's order in more detail in the context QCHC's motion for

## ii.    *Failure to Investigate*

Ordinarily, a defendant's failure to investigate—or, as Plaintiffs allege here, failure to investigate sufficiently—sounds in the fourth category of *Monell* liability: "the existence of a custom of tolerance or acquiescence of federal rights violations." *Helphenstine*, 60 F.4th at 323; *see Burgess*, 735 F.3d at 478. To survive summary judgment on a custom-of-tolerance theory, a plaintiff must make "a showing that there was a pattern of inadequately investigating similar claims." *Burgess*, 735 F.3d at 478 (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir. 2005); *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1248 (6th Cir. 1989)). In the absence of a showing of prior inadequate investigations, however, a plaintiff may still establish *Monell* liability if a single failure to investigate constitutes ratification of "illegal actions" by "an official with final decision making authority" (the second category). *Helphenstine*, 60 F.4th at 323; *see Burgess*, 735 F.3d at 479 ("Notwithstanding, a plaintiff would not need to establish a pattern of past misconduct where the actor was a policymaker with final policymaking authority."). For such a single-act theory to succeed, however, a plaintiff needs to show (1) "that a 'deliberate choice to follow a course of action is made from among various alternatives by the

---

summary judgment (where Plaintiffs contend more specifically that QCHC "failed to train its employees on how to treat a Court Order regarding an inmate"). (Doc. 76, at 11); *see infra* 48–49.

For purposes of the present motion, however, it is sufficient to note the following: (1) evidence suggesting individual actors were "put on notice that Ms. White had medical issues" is insufficient for *Monell* liability; (2) in any case, the record shows the County *did* take concrete steps to relay the contents of the email and the order to QCHC, which is evidence against deliberate indifference; and (3) most importantly, as explained above, there is no evidence suggesting that White's death would have been prevented had the County's deputies acted differently to facilitate getting her medication administered sooner. *See Monell*, 436 U.S. at 691 (finding municipalities cannot be held vicariously liable for the actions of individual officials under § 1983); (Doc. 47, at 149, 151–54; Doc. 54, at 147).

official'" and (2) that the resulting "course of action [was] the moving force behind or cause of the plaintiff's harm." *See id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)).

Here, as in *Burgess*, "Plaintiffs fail to point to any evidence of a pattern" of deficient investigations into deaths at Silverdale.[37] 735 F.3d at 478. Thus, even assuming the County's investigation was deficient, its failure to investigate must conform to the requirements for a single-act ratification claim. *See id.* at 479. Plaintiffs argue "[t]he insufficiency of Detective Short's investigation into Ms. White's death is astounding," but they fail to cite any evidence indicating Short was an official with final decision-making authority,[38] nor do they contend her investigative actions were ratified by such an official. (*See* Doc. 78, at 12–13.) For this reason alone, Plaintiffs cannot establish *Monell* liability based on Short's investigative actions, however deficient, and the County is therefore entitled to summary judgment on the failure-to-investigate claim. *See Helphenstine*, 60 F.4th at 323.

Accordingly, the Court will **GRANT** summary judgment to the County on all federal constitutional claims.[39]

---

[37] Specifically, at the summary judgment stage, Plaintiffs have failed to point to evidence in the record regarding previous investigations at Silverdale. (*See generally* Doc. 78.) Plaintiffs did devote a few pages of the complaint to what they alleged is a "history of medical neglect and inhumane conditions at Silverdale"; however, even leaving aside the issue that the incidents described therein appear in the complaint rather than the factual record or briefs at summary judgment, none of them concern *investigations* conducted by the County. (*See* Doc. 1, at 13–15.)

[38] This is true regardless of the ambiguities in the record concerning Short's identity. *See supra* note 19, at 19. Plaintiffs cite no evidence to demonstrate that either "Detective Short" or "Investigator Short" was an official with final decision-making authority. (*See* Doc. 78, at 5–6, 13–15.) (Presumably, the official with the requisite authority would have been Sherriff Hammond, but Plaintiffs provide no information about the County's command structures either way.)

[39] In reaching the foregoing decisions, the Court did not rely on the declarations of the witnesses Plaintiffs have moved to strike, Rodney Terrell and Richard Womack. (*See* Doc. 75.)

### B.    State Constitutional Claims Against the County

The County also contends it is entitled to summary judgment on Plaintiffs' state constitutional claims because there is no private cause of action for damages under the Tennessee state constitution.  (*See* Doc. 59, at 18–19.)  The County is correct:  Tennessee courts have found clearly and repeatedly that the state constitution does not provide a private cause of action for damages.  *See Bowden Bldg. Corp. v. Tenn. Real Est. Comm'n*, 15 S.W.3d 434, 446 (Tenn. Ct. App. 1999); *Silver v. Scott*, 591 S.W.3d 84, 102 n.2 (Tenn. Ct. App. 2019) ("there are some 53 other judicial opinions that quote or cite *Bowden* for this proposition").  Accordingly, the Court will **GRANT** the County's motion for summary judgment as to the state constitutional claims.[40]

### C.    State Tort Claims Against the County

Finally, the County contends it is entitled to summary judgment on Plaintiffs' state tort claims (negligence, negligence per se, wrongful death, and loss of consortium) because (1) it is immune to tort liability under the Governmental Tort Liability Act ("GTLA") and (2) the public-duty doctrine shields it from liability.  *See* Tenn. Code Ann. § 29-20-101 to 408; (Doc. 59, at 13–18).  Plaintiffs respond that the public-duty doctrine is inapplicable because the "special duty exception" to the doctrine applies.  (*See* Doc. 78, at 13–14.)

Under Tennessee law, "local governmental entities" have traditionally been "protected by the doctrine of sovereign immunity when acting in their governmental capacities."  *Sneed v. City of Red Bank, Tenn.*, 459 S.W.3d 17, 23–24 (Tenn. 2014).  The GTLA waives sovereign immunity for "counties, municipalities, and other local governmental entities" facing certain

---

[40] In addition, Plaintiffs' response brief does not address this argument (or otherwise defend their state constitutional claims).  (*See generally* Doc. 78.)  This failure to respond is, on its own, sufficient to grant summary judgment to the County because a plaintiff who fails to address a claim in response to a motion for summary judgment abandons the claim.  *See Brown*, 545 F. App'x at 372; *Hicks*, 449 F. App'x at 487.

types of tort claims. *See id.* at 24.[41]  However, the GTLA provides an exception to this waiver of sovereign immunity when an "injury arises out of . . . civil rights." § 29-20-205(2).  This exception applies to tort claims that arise "'from the same set of facts upon which [a plaintiff] allege[s] that his constitutional and civil rights ha[ve] been violated'" or otherwise sound in civil rights. *Mosier v. Evans*, 90 F.4th 541, 551–52 (6th. Cir. 2024) (quoting *Cochran v. Town of Jonesborough*, 586 S.W.3d 909, 913 (Ten. Ct. App. 2019)).  In addition, the public-duty doctrine shields state actors from suits for "injuries that are caused by . . . breach of a duty owed to the public at large," such that, when the GTLA waives sovereign immunity in a tort action, the public-duty doctrine may still apply. *See Ezell v. Cockrell*, 902 S.W.2d 394, 397, 400–01 (Tenn. 1995) (holding the doctrine was not abolished by the enactment of the GTLA).

Here, sovereign immunity applies to the state tort claims against the County because they arise from the same set of facts as Plaintiffs' civil-rights claims.[42] *See* Tenn. Code Ann. § 29-20-205(2); *Mosier*, 90 F.4th at 551; *Cochran*, 586 S.W.3d at 920 (noting the "well-established principle that statutes permitting suits against the State must be strictly construed" (citations omitted)).  Since the County's sovereign immunity is dispositive, the Court need not decide whether the public-duty doctrine would apply if the County were not immune. *See Ezell*, 902 S.W.2d at 400–01.  Therefore, the Court will **GRANT** the County's motion for summary judgment as to the state tort claims.

---

[41] As the *Sneed* court explains, Tennessee has historically been an outlier among states for extending sovereign immunity to local governmental entities at common law, and the enactment of the GTLA brought the state's sovereign immunity law more in line with the majority approach. *See id.* at 23–25.

[42] Plaintiffs' complaint makes this factual connection plain.  (*See, e.g.*, Doc. 1, at 26 ("While Plaintiffs have alleged that the acts and omissions set forth herein violated Decedent's constitutional rights, Plaintiffs further plead that the conduct alleged herein constitutes negligence under the laws of the State of Tennessee.").)

## IV.     QCHC, LORIE GRAVES, AMIE DURHAM, AND ERICA WATSON'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs bring claims against QCHC, Graves, Durham, and Watson for (1) violation of White's Eighth Amendment rights under 42 U.S.C. § 1983, (2) *Monell* liability pursuant to the Eighth Amendment violation under § 1983, (3) violations of Article 1, §§ 16 and 32 of the Tennessee state constitution, (4) wrongful death, and (5) loss of consortium. (*See* Doc. 1, at 16–30.) These defendants move for summary judgment on all claims. (Doc. 58.)

### A.     All Claims Against Graves, Durham, and Watson

A plaintiff who fails to address a claim in response to a motion for summary judgment abandons the claim. *See Brown*, 545 F. App'x at 372 ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."); *Hicks*, 449 F. App'x at 487 (holding that "[t]he district court properly declined to consider the merits of [the plaintiff's hostile work environment claim] because [the plaintiff] failed to address it . . . his response to the summary judgment motion").

Here, Plaintiffs have stated affirmatively that they "do not oppose Summary Judgment entering on behalf of Amie Durham, Erica Watson, and Lorie Graves." (Doc. 76, at 1.) This statement is sufficient to show abandonment of Plaintiffs' claims against these defendants under *Brown*. *See* 545 F. App'x at 372. Accordingly, the Court will **GRANT** summary judgment as to all claims against Durham, Watson, and Graves.

### B.     Federal Constitutional Claims Against QCHC

"A private entity . . . that contracts to provide medical services at a jail can be held liable under § 1983 because it is carrying out a traditional state function." *Winkler v. Madison Cnty.*, 893 F.3d 877, 904 (6th Cir. 2018) (citing *Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005)).

Like a municipality, however, "a government contractor cannot be held liable on a respondeat superior theory"—it can be held liable only "for a policy or custom" that would be sufficient for *Monell* liability. *Id.* (citing *Johnson*, 398 F.3d at 877 (internal citations omitted)). Thus, Plaintiffs' federal constitutional claims against QCHC must be evaluated under the same *Monell* standards that governed their claims against the County. *See id.*

Plaintiffs advance four theories of § 1983 liability against QCHC: (1) failure to train its employees in "adequate medication distribution," (2) failure to "train its employees in how to handle Court Orders" and outside medications, (3) failure "to contact Ms. White's medical provider[s]" regarding her prescriptions and underlying medical conditions, and (4) failure to investigate White's death. (Doc. 76, at 10–15.)

> ### i. Threshold Issue Regarding Individual Conduct

QCHC raises a threshold issue that is a potential bar to the federal claims at issue here: Given that Plaintiffs have abandoned their claims against the individual medical providers, what if anything must Plaintiffs establish regarding individual conduct to prevail against QCHC under *Monell*? (*See* Doc. 84, at 2–4.)

In *City of Los Angeles v. Heller*, the Supreme Court found that a municipality could not be held liable "based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm." 475 U.S. 796, 799 (1986). This language has led to some confusion, and multiple circuit courts have since suggested it may be something of an overstatement (or otherwise misleading). *See Grote v. Kenton Cnty., Ky.*, 85 F.4th 397, 414 (6th Cir. 2023). As the Sixth Circuit explained in *Grote*, "we, as well as circuits across the country, have recognized that *Heller* does not preclude a finding of municipal liability even if no individual officer violated the Constitution where constitutional harm has nonetheless 'been

39

inflicted upon the victim' and the municipality is responsible for that harm." *Id.* (quoting *Epps v. Lauderdale Cnty.*, 45 F. App'x 332, 334 (6th Cir. 2002) (Cole, J., concurring)) (citing *North v. Cuyahoga Cnty.*, 754 F. App'x 380, 389–90 (6th Cir. 2018); *Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002); *Speer v. City of Wynne*, 276 F.3d 980, 986 (8th Cir. 2002)). The *Grote* court explained further that, while Sixth Circuit "precedent has not been a model of consistency on this point," there are at least two scenarios where a *Monell* claim may proceed in the absence of individual liability: when individual officers are not liable due to qualified immunity, and "when the constitutional harm complained of related to a lack of action due to a failure to train" (such that no specific individual action affirmatively caused the harm). *Id.* Crucially, the *Grote* court does not suggest these two scenarios constitute an exhaustive list,[43] and other recent Sixth Circuit cases demonstrate further examples where *Monell* claims may persist without individual liability. *See id.*; *Andrews v. Wayne Cnty.*, 957 F.3d 714, 725 (6th Cir. 2020) (reaching the merits of a *Monell* claim by evaluating the individual actions of non-parties); *Coleman v. City of Cinncinnati*, 2023 WL 5095804, *4 (6th Cir. Aug. 9, 2023) (evaluating whether individual officers violated the plaintiff's rights as a threshold inquiry to *Monell* liability even when the individual officers had been voluntarily dismissed); *Stucker v. Louisville Metro Gov't*, 2024 WL 2135407, *5–6, *13 (6th. Cir. May 13, 2024) (finding a district erred in granting summary judgment to a municipality on a failure-to-train claim when individual liability was barred by an applicable statute of limitations).

Notwithstanding the complicated history of *Heller* jurisprudence, the Court finds Sixth Circuit precedent has become sufficiently clear to recognize the following rule: For a *Monell*

---

[43] QCHC's analysis of this issue, though not entirely clear, does seem to construe these two options (qualified immunity and a lack of action) as the only paths available to Plaintiffs. (*See* Doc. 84, at 4.) As the remainder of this discussion will show, the Court disagrees.

claim to survive summary judgment when no individual-actor claims will remain, there must be a genuine dispute of material fact as to whether an individual actor violated the plaintiff's constitutional rights *in fact*; it is immaterial whether the individual actor is actually held *liable* for the constitutional violation.[44] *See Grote*, 85 F.4th at 414; *Epps.*, 45 F. App'x at, 334 (Cole, J., concurring); *North*, 754 F. App'x 389–90; *Andrews*, 957 F.3d at 725; *Coleman*, 2023 WL 5095804 at *4; *Stucker*, 2024 WL 2135407 at *5–6. Here, therefore, Plaintiffs' abandonment of the individual-provider claims alone does not bar their *Monell* claims. *See Grote*, 85 F.4th at 414. As the *Stucker* court puts it, "*Monell* requires a constitutional injury, not the joinder of an officer acting unconstitutionally." 2024 WL 2135407 at *6. To prevail on its summary judgment motion due to a lack of an individual violation under *Heller* and its progeny, QCHC must show, as a matter of law, that no reasonable jury could find a violation of White's Eighth Amendment rights occurred under its employees' care; but QCHC cannot satisfy this burden. *See id.* at *5–6, *13 (applying Fourth Amendment standards to individual conduct as a threshold inquiry when officer liability was barred by statute of limitations); *Coleman*, 2023 WL 5095804 at *4 (applying *Brady* violation standards to individual conduct as a threshold inquiry when officer claims were voluntarily dismissed).

Plaintiffs' theory as to the individual violation in this case is that Watson violated White's Eighth Amendment rights by giving her olanzapine instead of divalproex on May 16, which in turn led to her death from the "[c]ombined toxicity [of] methadone and olanzapine."

---

[44] This articulation is consistent, moreover, with a concluding statement from the *Heller* court itself (which directly follows its much-debated language about the jury finding for the individual officer): "If a person has suffered *no constitutional injury* at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point." 475 U.S. at 799 (emphasis added; original emphasis omitted).

(Doc. 49, at 66–67.)  QCHC argues that this theory is "pure speculation," as "there is no evidence to suggest that Ms. Watson administered anything other than what is documented in the [MAR] records."  (Doc. 84, at 9–10.)  As QCHC emphasizes, the MARs Watson completed on May 16 indicate that she administered the correct medications, divalproex and levothyroxine, and there is evidence suggesting Watson would have taken steps to verify White's identify.[45] (*See id.*; Doc. 49, at 46–47, 164.)  However, there is at least some evidence to support Plaintiffs' theory, including (1) the autopsy report showing White ingested olanzapine; (2) that QCHC prescribed olanzapine at Silverdale; (3) deposition statements by Bates and Graves indicating olanzapine is not a "street drug"; (4) Watson's deposition statements indicating she did not know how to, or was otherwise unable to, complete the Verification Questions on the MARs; and (5) that on May 16, she likely carried medication envelopes in her hands rather than bringing her cart with her at pill pass.  (*See* Doc. 49, at 46–47, 66–67; Doc. 80, at 17, 31–33, 35–39, 49.)  The Court finds the above facts—particularly when there is no evidence in support of an *alternate* source of the olanzapine—constitute more than a "mere scintilla" of evidence that Watson may have incorrectly administered the olanzapine to her.  *See Brown v. Battle Creek Police Department*, 844 F.3d 556, 565 (6th Cir. 2016) ("a 'mere scintilla' of evidence will not be

---

[45] For instance, citing the deposition of Plaintiffs' expert Jenelle Lea, QCHC states, "Plaintiffs' own expert . . . realized that Ms. Watson relied upon guards to identify those inmates she did not know, using a handheld photo recognition device."  (Doc. 84, at 9.)  The actual deposition statement QCHC cites suggests it was the general practice of employees including Watson to consult guards operating these devices to identify patients at pill pass, though it arguably falls short of showing that Watson specifically used this method to identify White on May 16: "However, in reviewing [Watson's] deposition—now, she should probably have phrased that differently, because they have the handheld device that can identify anyone they don't know. And the—a guard should be with them with one of those devices.  It doesn't appear that the nurses have them, but the guards have them."  (Doc. 49, at 164.)  Still, even assuming Watson successfully verified White's identity, that leaves the possibility that she could have given her the wrong pill.

enough for Plaintiffs to withstand summary judgment") (citing *Ciminillo v. Streicher*, 434 F.3d 461, 434 (6th Cir. 2006)).

Yet for Watson's actions to constitute a constitutional violation, not merely a negligent administration of medical care, there must be a genuine question of material fact as to the objective and subjective elements of an Eighth Amendment violation. *See Griffith*, 975 F.3rd at 567; *Farmer*, 511 U.S. at 837. Under the objective component, a reasonable jury could find White had a "sufficiently serious medical need" to be treated for seizure prevention and bipolar disorder because she was prescribed divalproex by her outside physician, who instructed her to stop taking it "under no circumstances," for those purposes. *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013) (citing *Farmer*, 511 U.S. at 834) (internal citations omitted); (*see* Doc. 80, at 4–5). Under the subjective component, a reasonable jury could find Watson was aware of White's serious need for medical treatment because she was tasked with administering the divalproex—a drug that treats serious medical conditions. *See Griffith*, 975 F.3rd at 567; (Doc. 49, at 46–47). There is then a question of material fact as to whether Watson disregarded "a substantial risk of serious harm" by not only failing to administer the divalproex to White but instead giving her *another* medication. *Farmer*, 511 U.S. at 837. To the extent QCHC argues that Watson did not in fact "[know] of and disregard[]" a serious risk to White's health, that is a question of Watson's credibility and is properly left for the jury. *Helphenstine*, 60 F.4th at 305; *see id.* at 314 (noting that "[c]redibility determinations . . . are jury functions" and, thus, should not be made by a judge ruling on summary judgment) (citing *Anderson*, 477 U.S. at 255).

Additionally, Plaintiffs and QCHC dispute whether Watson would have been aware that White was experiencing withdrawal on the morning of May 16. (*See* Doc. 58, at 15; Doc. 76, at 10–12.) The possibility that she was detoxing from methadone while at Silverdale may well be

something of a red herring, however, because Plaintiffs have not established a *causal connection* between methadone withdrawal and her death. (*See* Doc. 76.) Rather, given the autopsy report's finding that the cause of death was the "[c]ombined toxicity [of] methadone and olanzapine," which Plaintiffs do not dispute, White's death was contingent on *having* methadone in her system, not detoxing from it. (Doc. 49, at 66–67.) (Seemingly, that is, she could have died from this combined toxicity *even if* she had been taking methadone daily while at Silverdale. (*See id.*))

Thus, QCHC has not shown it is entitled to judgment as a matter of law on the issue of whether an Eighth Amendment violation occurred.

### ii.     Failure to Train:  Medication Distribution

Plaintiffs contend that "QCHC failed to train its medical personnel in adequate medication distribution," as well as its Continuity of Medication policy. (Doc. 76, at 10.) This argument is specific to "Ms. Watson's careless distribution of medication on May 16, 2022," as Plaintiffs do not discuss any other QCHC staff member's actions with respect to these policies. (*See id.*) The Court has found there is a genuine question of material fact regarding whether Watson's conduct violated White's constitutional rights; the Court must now evaluate whether a reasonable jury could find that conduct was the product of a failure to train on the part of QCHC under *Monell*. *See Helphenstine*, 60 F.4th at 323.

During Watson's deposition, she admitted she did not recall completing the "CorrecTek Essentials MAR – Accessing the MAR lesson" training prior to November 2022. (*See* Doc. 80, at 28–29.) Her deposition statements also suggested she was unfamiliar with QCHC's

Continuity of Medication policy.  (*See id.* at 30.)[46]  QCHC, for its part, has not cited any

evidence in the record regarding its training practices; it cites no relevant training materials,

training policies, or any other evidence as to what training Watson could have received to

prepare her to administer White's medications at Silverdale.  (*See* Docs. 56, 84, 85.)  Based on

the facts in the record, then, a reasonable jury could find QCHC's training was inadequate

regarding the administration of medications at pill pass; moreover, given the dearth of

countervailing evidence on QCHC's side, a reasonable jury could even find Watson received *no*

*training* relevant to her administration of medications until November 2022—five months after

White's death.  (*See* Doc. 80, at 28–29.)  And considering that QCHC nonetheless had Watson

administer White's medications on May 16, despite a lack of evidence indicating she had been

adequately trained to do so, a reasonable jury could find QCHC's failure to train Watson

demonstrated deliberate indifference to White's Eighth Amendment right to medical treatment.

*See Helphenstine*, 60 F.4th, at 325 ("Asking employees to use professional judgment that lies

outside their area of expertise may demonstrate deliberate indifference") (citing *City of Canton v.*

*Harris*, 489 U.S. 378, 390 (1989)).  Put differently, a reasonable jury could find that QCHC

---

[46] Recall that when Watson was asked about the Continuity of Medication policy (which deals with outside medications) at deposition, she responded, "I don't do medical intakes."  (Doc. 80, at 30.)  This response illustrates why this fact alone will be insufficient for Plaintiffs' claim to withstand summary judgment:  since the record demonstrates that Watson was not involved in White's intake (or, indeed, intakes in general) and thus had no responsibilities relating to her outside medications, Plaintiffs cannot account for how Watson's lack of knowledge on this topic could have been a cause of White's death.  (*See id.*; Doc. 49, at 52–57.)  Accordingly, and as the remainder of the Court's analysis will demonstrate, this claim will turn on the training relevant to tasks Watson *did* perform, including administering medications and completing MARs.  (*See id.* at 46–47.)

In addition, as the Court explained previously, Plaintiffs allege that Watson was unfamiliar with two additional policies, but they fail to cite any evidence in the record demonstrating as such.  *See supra* note 25, at 21.  "Conclusory allegations are not evidence and are not adequate to oppose a motion for summary judgment."  *Miller v. Aladdin Temp-Rite, LLC*, 72 F. App'x 378, 380 (6th Cir. 2003).  Thus, these allegations do not affect the Court's analysis here.

acted with deliberate indifference by failing to "equip[ its employees] with the tools necessary" to satisfy constitutional obligations.  *Id.* (citing *Connick*, 563 U.S. at 70) (internal citations omitted).[47]

Finally, there is the issue of causation—whether QCHC's failure to train "was closely related to or actually caused" White's death.  *Helphenstine*, 60 F.4th at 323.  As explained in the previous section, there is a genuine dispute of material fact regarding whether Watson administered the wrong medication to White on the morning of May 16; a reasonable jury could find that QCHC's failure to train Watson in medication distribution caused (or, at minimum, was "closely related to") White's death.  *Id.*  Therefore, QCHC is not entitled to summary judgment on this failure-to-train claim.[48]

### iii.       Failure to Train:  Court Orders and Outside Medications

Plaintiffs also contend QCHC "failed to train its employees in how to handle Court Orders and medication that comes with an inmate to Silverdale."  (Doc. 76, at 11.)  Evidence in

---

[47] In lieu of affirmative evidence regarding its training, QCHC seems to rely on certain deposition statements of Plaintiffs' expert, Jenelle Lea, that it construes as opining its medical personnel performed adequately, seemingly to suggest QCHC and its medical personnel were not deliberately indifferent.  (*See* Doc. 58, at 7–9.)  But even insofar as some of Lea's statements may be consistent with QCHC's position regarding its lack of liability, her deposition cannot bear the weight of its motion.  (*See id.*)  For instance, when asked if she had "any criticisms" of Watson's performance at pill pass on May 16, Lea said this:  "*If she got the correct medication and Mrs. White wasn't showing any symptoms that were untoward, that she needed to report back to an RN about, then I have no criticism of her.*"  (Doc. 49, at 166 (emphasis added).)

[48] To be clear, this failure-to-train claim is not without flaws, and a reasonable jury could ultimately find for QCHC on multiple grounds, such as the threshold issue of Watson's deliberate indifference or the *Monell* issue of causation.  However, given (a) that there is at least some genuine question of material fact as to each relevant element and (b) the notable gaps in the factual record regarding this claim (including the lack of affirmative evidence of QCHC's training), the Court finds QCHC has not satisfied its burden on summary judgment.

Nothing in this Order should be construed as precluding QCHC from moving for judgment as a matter of law at the close of proof under Rule 50.

the record shows that Judge Greenholtz, who sentenced White to a term of incarceration at Silverdale at Hamilton County Criminal Court, added a hand-written note to the custody order stating, "Medication to be allowed," and listing White's prescribed doses of divalproex, hydroxyzine, and levothyroxine. (Doc. 54, at 147.) QCHC's CEO, Dr. Bates, stated in his deposition, "with all due respect to the judge, that order is not enforceable." (Doc. 80, at 21.)

The Court first notes that, although Plaintiffs cite Dr. Bates's statement as evidence of QCHC's failure-to-train liability, he appears to be correct as a matter of law: Tennessee state law gives broad authority to the state's Department of Corrections—not state courts—to administer criminal sentences, which includes the provision of medical treatment to state prisoners. *See generally* Tenn. Code Ann. § 41-21-204 (governing the Department of Correction's administration of "Health Care and Treatment; Psychological Services"), § 41-21-206 ("Availability of Healthcare Products to Incarcerated Women"), § 41-4-115 ("Health Care and Treatment; Co-pay Amounts; Reimbursement for Expenses"). Indeed, Plaintiffs have cited no law supporting the proposition that state court judges have *any* authority over the administration of criminal sentences once they are imposed. (*See* Doc. 76, at 11–12.) Given this distribution of authority over the medical treatment of inmates—and that Plaintiffs do not contest *that* violates the Eighth Amendment—it is unclear how a failure to train prison medical providers on court orders would be inadequate, let alone how it could constitute deliberate indifference to constitutional rights. *See Estelle*, 429 U.S. at 104–06; *Helphenstine*, 60 F.4th at 323. It is not "patently obvious," that is, that a failure to train medical providers on "how to treat" unenforceable court orders (which they would not be expected to consult ordinarily given the limits of judicial authority with respect to prison sentences) would lead to a violation of inmates' Eighth Amendment right to medical care. *Connick*, 563 U.S. at 64; (Doc. 76, at 11).

Plaintiffs further argue that "QCHC and the Hamilton County Jail, between the two entities, have multiple different written policies on how to deal with medication that is brought in by an inmate." (Doc. 76, at 11.) With respect to QCHC's policies, Plaintiffs cite deposition statements from Watson and Graves indicating, respectively, that "we do not give meds from a person . . . they're put in [inmates'] property" and "the jail puts them in their property—we don't." (Doc. 80, at 30, 48 (cleaned up).) As a reasonable jury could not find these statements inconsistent with *each other*, Plaintiffs seem to be suggesting the problem is that they are inconsistent with the County's written policies insofar as those indicate correctional staff should do something other than store outside medications with an inmate's property. *See supra*, at 33–35. Plaintiffs do not cite any authority for the proposition that inconsistencies between the policies of a municipality and its prison-healthcare contractor can support *Monell* liability for the contractor; but even assuming QCHC's policies regarding outside medications are in some way inconsistent or unclear, this argument fails as a matter of law on the deliberate indifference and causation elements for the same reasons that it did against the County. *See id.*; (Doc. 76, at 11–12). Thus, QCHC is entitled to summary judgment on this failure-to-train claim.

### iv. *Failure to Contact Medical Providers*

Plaintiffs contend that, based on "multiple written Hamilton County and QCHC policies, there was a duty on medical personnel to take Ms. White's medication, verify it, and contact medical providers to gain proper insight into the necessity of the medications." (Doc. 76, at 12.) Plaintiffs further argue the following: "This deliberate indifference starts at the top at QCHC and filters down the chain. Dr. Bates testified that he 'did not have to speak to her provider' when questioned about whether discontinuing the levothyroxine would be detrimental to Ms. White and he answered in the negative." (*Id.*)

It is not clear to the Court how these contentions fit within an existing doctrinal framework for *Monell* liability. *See Helphenstine*, 60 F.4th at 323. To the extent QCHC's medical personnel failed to *follow* relevant written policies, their individual failures would be insufficient to support *Monell* liability in the absence of evidence that QCHC *failed to train* its medical personnel in accordance with its policies.[49] *See id.* Plaintiffs' suggestion that QCHC's "deliberate indifference starts at the top [with Dr. Bates] and filters down the chain"—a theme they reiterate throughout this section of the brief[50]—fails to explain how QCHC's or its employees' conduct conforms to a *Monell* framework rather than a vicarious-liability one. (Doc. 76, at 12); *see Monell*, 436 U.S. at 691. Perhaps, for instance, Plaintiffs are suggesting Bates ratified a decision not to contact White's medical provider, or perhaps they are implying a custom-of-tolerance theory; regardless, Plaintiffs make no effort to conform their argument regarding outside providers to either of these theories, and they cite no evidence that would raise a genuine issue of material fact as to any of the specific *Monell*-liability standards for these theories. *See Helphenstine*, 60 F.4th at 323; (Doc. 76, at 12–13).[51]

In sum, Plaintiffs' arguments regarding QCHC's "fail[ure] to contact Ms. White's medical provider[s]" sound predominantly if not entirely in vicarious liability, which is not

---

[49] There are at least two additional, *significant* problems here: (1) as the Court explained in the previous section, Plaintiffs have cited no evidence to show that *QCHC*—as opposed to the County—has any policies indicating its employees should contact prescribing physicians regarding outside medications; and (2) also consistent with the previous section and the Court's analysis of the relevant County policies, Plaintiffs have made no effort to account for how a failure to contact White's outside medical providers would have been causally connected to her death. *See id.*; (Doc. 76, at 12–13.)

[50] Plaintiffs go on to state, for instance, that Bates's "deliberate indifference filtered down to his employees as neither NP Graves nor Nurse Swafford called to verify the medications from Dr. Steven Spaulding." (Doc. 76, at 12.)

[51] *See also* the following section on Plaintiffs' failure-to-investigate claim, where the Court will discuss the elements of ratification and custom-of-tolerance claims in more detail.

cognizable under § 1983. *See Monell*, 436 U.S. at 691. To the extent Plaintiffs' arguments on this topic can be construed as suggesting a viable *Monell* claim, they are conclusory at best and, thus, "not adequate to oppose a motion for summary judgment." *Miller*, 72 F. App'x at 380. As a result, QCHC is entitled to summary judgment on this claim.

### v. *Failure to Investigate*

As the Court explained previously, Plaintiffs have "fail[ed] to point to any evidence of a pattern" of deficient investigations into deaths at Silverdale. *Burgess*, 735 F.3d at 478; (*see generally* Doc. 76). Thus, even assuming QCHC's investigation into White's death was deficient, its failure to investigate must have been (a) ratified by an official with final decision-making authority, (b) a "deliberate choice . . . made from among various alternatives by the official," and (c) "the moving force behind or cause of" White's death. *See id.* at 479 (internal citations omitted). Establishing a causal link between a single failure to investigate and a plaintiff's injury will be necessarily difficult because, as the Sixth Circuit explained in *Pineda v. Hamilton Count, Ohio*,

> [A]n entity's failure to investigate the plaintiff's specific claim will, by definition, come *after* the employee's action that caused the injury about which the plaintiff complains. Because the injury will have already occurred by the time of the specific investigation, "there can be no causation" from that single failure to investigate. . . . A series of investigative failures before the plaintiff's injury, by contrast, might at least suggest that the local entity's custom led to the employee's harmful action in the plaintiff's own case.

977 F.3d 483, 495 (6th Cir. 2020) (emphasis in original) (quoting *David v. City of Bellevue*, 706 F. App'x 847, 853 (6th Cir. 2017)). In *Burgess*, for instance, the Sixth Circuit found that a sheriff's "approval of [a] *post hoc* investigation" was insufficient to establish *Monell* liability because, given that investigation occurred after the alleged constitutional deprivation, it "did not itself cause" the plaintiff's injury. 735 F.3d at 479.

50

Here, Plaintiffs cannot prevail on a ratification theory, because the causation element is plainly lacking. *See id.*; *Pineda*, 977 F.3d at 495; *David*, 706 F. App'x at 853. While a reasonable jury could find that Dr. Bates, an official with final decision-making authority, ratified QCHC's deficient investigation from among various alternatives, a reasonable jury could *not* find that this ratification caused an "injury [that had] already occurred." *Pineda*, 977 F.3d at 495. Thus, QCHC is entitled to summary judgment on the failure-to-investigate claim.

To summarize accordingly, the Court will **DENY** QCHC's motion for summary judgment as to its failure-to-train claim regarding medication distribution; it will **GRANT** summary judgment on all other § 1983 claims.

### C.     State Constitutional Claims Against QCHC

QCHC contends it is entitled to summary judgment on the state constitutional claims for the same reasons it argues it is entitled to summary judgment on the federal claims: "such claims run parallel and are essentially identical to the claims made under the federal constitution . . . Because Plaintiffs' claims of constitutional deprivation under the federal constitution fail, the claims of deprivation under the Tennessee Constitution fail as well." (Doc. 58, at 16–17.) The Court cannot grant summary judgment on this ground, because one of the federal constitutional claims against QCHC—a *Monell* failure-to-train claim—will proceed; therefore, the Court will **DENY** summary judgment as to the state constitutional claims.[52]

---

[52] However, as the Court explained in finding the County is entitled summary judgment on the state constitutional claims, it appears there is no private cause of action for damages under the Tennessee state constitution. *See supra*, at 38; *Bowden Bldg. Corp.*, 15 S.W.3d at 446. Accordingly, the Court will order briefing on this issue under Rule 56(f) in a separate order.

### D. Wrongful Death Claim Against QCHC

QCHC contends it is entitled to summary judgment on the wrongful death claim because Plaintiffs have failed to comply with relevant statutory prerequisites under the Tennessee Healthcare Liability Act. (*See* Doc. 58, at 22 (citing Tenn. Code Ann. §§ 29-26-101, 121, and 122).) Plaintiffs did not respond to this argument in their brief and, therefore, have abandoned their wrongful death claim under *Brown*.[53] *See* 545 F. App'x at 372. Accordingly, the Court will **GRANT** summary judgment to QCHC on the wrongful death claim.

### E. Loss of Consortium Against QCHC

The Parties agree that loss of consortium is a derivative claim, such that QCHC's motion for summary judgment on it depends on whether any of Plaintiffs other claims remain. (*See* Doc. 58, at 22–23; Doc. 76, at 15.) "[A] derivative claim for loss of consortium is available in the context of [a] § 1983 action brought by a person whose constitutional rights were violated in such a manner as to cause him personal injury." *Kinzer v. Metro. Gov't of Nashville*, 451 F. Supp. 2d 931, 947 (M.D. Tenn. 2006). Thus, since one of Plaintiffs' § 1983 claims will proceed

---

[53] On December 23, 2024, QCHC filed a supplement to its summary judgment motion alerting the Court to authority that runs contrary to its original argument regarding statutory prerequisites—specifically, the Sixth Circuit's holding in *Albright v. Christensen* that these procedural requirements are not mandatory when a healthcare liability action is filed in federal court. (*See* Doc. 68, at 2 (citing 24 F.4th 1039, 1045–48 (6th Cir. 2022).) QCHC now contends that "a good faith argument does exist for the modification of existing law to reinstate the pre-suit notice requirement in federal actions, as explained by Judge Siler in his dissent in the *Albright* case." (*See id.* at 3.)

Given that Plaintiffs filed their response to QCHC's motion for summary judgment on January 13, 2025, they had sufficient notice of this supplemental filing and still elected not to respond to QCHC's argument or otherwise address their wrongful death claim. (*See* Doc. 76.) As a result, the Court need not consider the merits of QCHC's contentions regarding the *Albright* case because, by not addressing the wrongful death claim at all in their response brief, Plaintiffs have abandoned the claim regardless of whether state statutory prerequisites would apply.

52

against QCHC, a derivative claim for loss of consortium is available.  *See id.*  The Court will accordingly **DENY** QCHC's motion for summary judgment as to the loss of consortium claim.

## V. JIM HAMMOND'S MOTION FOR SUMMARY JUDGMENT

Here, Plaintiffs have stated affirmatively that they "do not oppose Summary Judgment on behalf of Sheriff Jim Hammond."  (Doc. 78, at 1.)  This statement is sufficient to show abandonment of Plaintiffs' claims against Hammond under *Brown*.  *See* 545 F. App'x at 372. Accordingly, the Court will **GRANT** summary judgment as to all claims against Hammond.

## VI. JOHN AND JANE DOES 1-15'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs have also stated affirmatively that they "do not oppose Summary Judgment entering on behalf of the John and Jane Doe Individuals 1-15."  (Doc. 78, at 1.)  This statement is sufficient to show abandonment of Plaintiffs' claims against these defendants under *Brown*.  *See* 545 F. App'x at 372.  Accordingly, the Court will **GRANT** summary judgment as to all claims against John and Jane Does 1-15.

## VII. CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS** the County's motion for summary judgment (Doc. 55); all claims against the County are hereby **DISMISSED**.  The Court **GRANTS IN PART** QCHC, Graves, Watson, and Durham's motion for summary judgment (Doc. 48) as to all claims against Graves, Watson, and Durham; the § 1983 failure-to-train claim to the extent it relates to court orders; the § 1983 claim relating to failure to contact medical providers; the § 1983 failure-to-investigate claim; and the state law wrongful death claim.  These claims are hereby **DISMISSED**.  The Court **DENIES IN PART** QCHC's motion for summary judgment (Doc. 48) as to the following claims, which will proceed:  the § 1983 failure-to-train claim to the extent it relates to medication distribution, the Tennessee state constitutional claim,

and the loss of consortium claim. Further, the Court hereby **GRANTS** Jim Hammond's motion

for summary judgment (Doc. 56) and John and Jane Does 1-15's motion for summary judgment

(Doc. 57); all claims against these defendants are hereby **DISMISSED**.

In addition, since no claims remain against the County, Plaintiffs' motion (Doc. 75) to

strike the County's declarations of two witnesses, Rodney Terrell and Richrd Womack, is hereby

**DENIED AS MOOT**.

**SO ORDERED.**

_**/s/ Travis R. McDonough**_
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**